DENNIS L. HOGGATT,           )
                                        )

      Plaintiff,         )
                                          )

v.                              )     Case No. 3:09-cv-0798
                                        )

ELECTROLUX HOME PRODUCTS, INC.,  )     Judge Thomas A. Wiseman, Jr.
                                        )

      Defendant.       )

## MEMORANDUM OPINION

Plaintiff Dennis L. Hoggatt brings suit under the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12101 *et seq.*, the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103, and the Tennessee Human Rights Act, Tenn. Code Ann. §§ 4-21-101 *et seq.*, alleging that Defendant Electrolux Home Products, Inc. ("Electrolux") violated federal and state law by discharging him based upon a disability and by failing to reasonably accommodate his disability. Defendant denies liability and asserts that Hoggatt was discharged because of his failure to comply with Electrolux's attendance policy.

Both parties have now filed motions for summary judgment in their favor. For the reasons set forth herein, the Court finds that disputed issues of material fact preclude entry of summary judgment for either party. The motions will therefore be denied.

## I.     STANDARD OF REVIEW

Summary judgment may be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its

pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of concrete evidentiary material in support of its position. *Celotex*, 477 U.S. at 324.

In deciding a motion for summary judgment, the Court must presume that the evidence of the non-moving party is true and resolve all doubts and inferences in favor of the non-moving party. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). Summary judgment shall be rendered only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

The standard of review for cross motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). Significantly, "[t]he filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Id.* at 248 (citation omitted). Rather, in reviewing cross motions for summary judgment, courts are to "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).

With these principles in mind, the Court will evaluate each motion separately, as the facts differ substantially depending on whose perspective is adopted.

## II. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. Factual Background

The facts forth in this section are either undisputed or viewed in the light most favorable to Hoggatt as the non-moving party for purposes of Electrolux's motion for summary judgment.

Plaintiff Dennis Hoggatt is a former employee of defendant Electrolux. Hoggatt has Type II diabetes and high blood pressure. According to Hoggatt, his diabetes affects his ability to work insofar as it requires him to be able to take frequent bathroom breaks and impairs his ability to perform strenuous

manual labor or to work in a hot environment. He claims that heat and manual labor cause his blood sugar to drop to a dangerously low level. (Hoggatt Dep. 48:1–23.)

Hoggatt began his employment at Electrolux's Springfield, Tennessee facility as a temporary employee for Randstad on July 9, 2007. When Hoggatt began working for Randstad, he took a class and became certified to drive a forklift. He worked in Electrolux's main plant operating a forklift for approximately a month. He was then assigned to Electrolux's Holley Carburetor Building, across the street from the main plant, where he worked for several months sorting and weighing parts. The building in which he was working was not air-conditioned, but he worked second shift, and the area in which he worked had a "great big garage door that was open and air circulated through that room." (Hoggatt Dep. 57:9–12.) He did not have any problems with the heat while he did that job.

Hoggatt was transferred to the Wilson Street Building at the Electrolux facility in January 2008. He was working there on January 18, 2008 when he became a full-time Electrolux employee. He operated a forklift on second shift at that facility until July 13, 2008. At the time he began working in the Wilson Street Building, Hoggatt was told that it was a temporary job, though his supervisor, Shelia Dorris, also told him the company was considering making it into a full-time, permanent position. (Hoggatt Dep. 59:23–60:5.) The Wilson Street Building was not air-conditioned, but Hoggatt did not have a problem with the heat there because the overhead doors were open and numerous ceiling fans circulated air through the building.

Hoggatt's job at the Wilson Street Building came to an end when Electrolux "decided to discontinue the second shift" at that facility. (Hoggatt Dep. 61:16–18.) The other employee who worked second shift with Hoggatt at that location transferred back to first shift, and Hoggatt was told that he would be transferred back to the main plant to work. Hoggatt testified that his supervisor offered him a choice of three jobs, all having "something to do with material coordinator." (Hoggatt Dep. 90:13–16.) He chose a "material handler" job at the main plant (Hoggatt Dep. 62:12–14), because he believed he would be on a forklift doing the same type of work he had been doing previously. (Hoggatt Dep. 62:16–18.). Hoggatt was transferred on July 14, 2008. Hoggatt had by then been a full-time Electrolux employee since January, a period of around six and one-half months.

Hoggatt was transferred to the main plant and, instead of working as a forklift operator, he was

placed in a position responsible for handling parts, "sorting out bad parts to be either scrapped or repainted and hauling off pieces of material and then cutting [Styrofoam] for them to wrap parts in so they . . . would not get scratched up." (Hoggatt Dep. 91:23–92:5.)

Hoggatt testified in his deposition that he was in this position for two to three weeks. (Hoggatt Dep. 92:9–10.) Documentary evidence from Electrolux indicates Hoggatt was in the position exactly one week, from July 14, 2008 until July 21, 2008. During that period, Hoggatt was "getting constantly overheated in that area of the building, and . . . was constantly going to the nurse's office." (Hoggatt Dep. 92:19–22.)

After approximately one week at the new position, Hoggatt "talked to human resources about going on medical leave, and . . . was on medical leave from approximately mid-July to mid-September." (Hoggatt Dep. 96:25–97:3.) He does not remember to whom he spoke, but it was a woman who "gave [him] the forms to fill out and everything." (Hoggatt Dep. 97:18–20.) He told the person he was "having troubles and . . . was seeing [his] doctor about [his] blood sugar bottoming out." (Hoggatt Dep. 101:18–20.) He filled out the paperwork at home that night and returned it to human resources the next day. At that point, he was "under the impression that [he] was on leave from [his] job." (Hoggatt Dep. 97:7–9.) He believed the forms were "under the Family Medical Leave Act or something like that." (Hoggatt Dep. 98:1–3.) He claims he thereafter received either a phone call or a letter from Unum telling him that his request for leave had been approved. Shortly thereafter he received another letter from Unum, dated July 25, 2008, which stated that he "was not eligible for leave under the FMLA, and the requested leave will not be counted against your annual FMLA leave entitlement because you have not worked for your current employer for at least 12 months, nor have you worked at least 1,250 hours for your employer within the previous 12 months." (Hoggatt Dep. Ex. 5.) Hoggatt was confused by the language of this letter. He understood he was not approved for FMLA leave but remained under the impression that he was on medical leave that was not covered by FMLA. He never received a phone call or a letter from Electrolux telling him he either had or had not been approved for leave, and Electrolux never called him to say, "If you don't come to work, you're fired." (Hoggatt Dep. 103:16–19.)

Electrolux had in place a procedure for allowing employees who had been employed less than twelve months to take "physical disability and personal leave not covered by the FMLA." (Johnson Dep.

45:18–21.) Hoggatt apparently did not follow the appropriate procedures for taking such leave, and Electrolux claims he never informed his supervisors of the reason for his extended absence during the summer of 2008. However, Hoggatt was never told by anyone at Electrolux that his request for leave had not been approved, nor provided information regarding medical leave that was not covered by FMLA. Moreover, Electrolux never informed Hoggatt that he was discharged, nor did it change his employee status in its records during the period when Hoggatt was out. In addition, Electrolux's records reflect that Hoggatt's supervisors knew he had requested medical leave.

Electrolux has a "no-fault" attendance policy that applies throughout its Springfield facility and establishes the number of absences an employee may have without disciplinary consequences. Under this policy, all associates begin their employment with Electrolux with +2 attendance points. Employees may earn additional points, up to +8, by going thirty or sixty calendar days without missing a day of work. Employees are given negative attendance points for being tardy, leaving early, or being absent, as follows: a half-point deduction for leaving early or arriving late; a one-point deduction for being absent if the employee called in prior to the start of the shift; and a two-point deduction for being absent if the employee failed to call in prior to the start of the shift. Employees whose points dip down to -1 are placed on disciplinary probation; employees whose points descend to -2 are discharged.

Notwithstanding, Electrolux's attendance-tracking system is not fully automated. If any employee is tardy or leaves early, the attendance tracking system will automatically register the appropriate attendance point. If the employee is absent, his or her supervisor must manually enter the appropriate number of points into the attendance-tracking system.

By April 2008, Hoggatt was down to -1 attendance points and was given a written warning informing him that if he missed any additional time prior to August 2008 his employment would be terminated. Electrolux alleges that, although Hoggatt was absent from mid-July until mid-September 2008, these absences were not recorded in Electrolux's attendance-tracking program because of a misunderstanding regarding who was responsible for entering Hoggatt's absences into the system. As a result, when Hoggatt notified Electrolux that he wanted to return to work in September 2008, the Human Resources Department was not initially aware that Hoggatt had allegedly exceeded the allowed number of absences.

The parties dispute whether Hoggatt was actually terminated and rehired in mid-September, or simply "reinstated" after a technically unauthorized medical leave. (*See* Norton Dep. 45:1–3.) In any event, it is undisputed that when Hoggatt requested to return to work, he was told he needed to get a physician's authorization to return to work without restrictions. He did so. Further, when he returned to work, he was not treated as a new hire for purposes of the company's attendance policy. Instead of the +2 attendance points with which a new hire would have started, he returned to work with 0 attendance points, and was informed that as a condition of reemployment he needed to maintain "perfect" attendance for the next ninety days.

By the time he returned to work at Electrolux in September 2008, Hoggatt's prior position had already been filled. He was placed instead in the "bake-off" or "Blue Surf" room. However, he immediately reported that he had trouble with the heat in that room, which regularly reached 120 to 130 degrees. He asked to be moved to a forklift-operator position or moved to a truly cooler work area. (Hoggatt Dep. 124–25.) In response to Hoggatt's complaints, Electrolux moved him to the paint line, in a job that involved hanging parts on the paint line. Although the area where the paint line was located had air-conditioning, it was still "warm," even hot in the summer, but nonetheless cooler than the bake-off room. (Slagle Dep. 18:21–19:9.) According to Hoggatt, the area was still very hot and involved physically demanding labor. As a result, he became extremely ill the second day working there. He went to the nurse's station and reported that the extreme heat was making him ill and that he needed to go home.

Before going home, however, Hoggatt had a meeting that same day, September 18, 2008, with Veronica Johnson, Human Resources Supervisor for Electrolux, and Jacqueline Clark, one of Hoggatt's supervisors.[1] According to Hoggatt, he was told at that meeting that he was being discharged because his "diabetes was a danger to [him]self and a risk to [the] company." (Hoggatt Dep. 119:3–6, 135:8–11.) Hoggatt was escorted from the facility by supervisor James Pinner, who told him he "should consider just going on disability." (Hoggatt Dep. 119:11–12.)

Other than requesting to be moved to a cooler area and requesting at least twice to be moved back into a forklift-operator job, Hoggatt did not ask for any accommodation from Electrolux. He

---

[1] Beth Slagle was his actual supervisor on the paint line. She was out on September 18 and her shift was being covered by Jacqueline Clark.

contends, however, that Electrolux was well aware of his diabetic condition and his inability to perform strenuous manual labor in a hot environment. When he asked at human resources if he could be placed in a forklift-operator job, he was told "they weren't sure they had any forklift jobs open." (Hoggatt Dep. 122:23–24.) He was told they would "let [him] know," but he never heard anything further about the matter. Hoggatt has presented evidence, however, indicating that a forklift operator position had become open on September 17, around the same time he was requesting to be assigned to work as a forklift driver.

Electrolux claims Hoggatt was unable to perform the job he was required to perform at Electrolux. Hoggatt agrees he was unable to perform in the "extremely hot" "bake off" or "paint line" areas, but claims he was able to perform the forklift job on second shift as he had previously done, even during the summer months, and claims Electrolux could have assigned him to drive a forklift.

After his employment with Electrolux terminated, Hoggatt applied for Social Security Disability Insurance Benefits ("DIB"). Included in his DIB application is a sworn statement that he had become unable to work because of his disabling condition on September 18, 2008. Also included in his application is a medical certificate completed in November 2008 stating Hoggatt was not able to work. The Social Security Administration denied Hoggatt's application for benefits, however, based on its review of the medical evidence and its conclusion that Hoggatt was able to perform a forklift operator job.

### B. Applicable Law and Analysis

Under both the ADA and Tennessee state law, it is illegal for a covered employer to discriminate against a qualified individual with a disability in the terms and conditions of his employment because of his disability. 42 U.S.C. § 12112(a); Tenn. Code Ann. § 8-50-103(b). A plaintiff may establish disability discrimination under either statutory scheme by showing that (1) he is disabled within the meaning of the statutes; (2) he is "otherwise qualified" to perform the essential functions of the job he held or desired, with or without a reasonable accommodation; and (3) he suffered an adverse employment action because of his disability.[2] *Henderson v. Ardco, Inc.*, 247 F.3d 645, 649 (6th Cir. 2001) (citing *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996)); *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d

---

[2] The ADA was amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008), which took effect on January 1, 2009 and therefore is inapplicable in this case.

698, 705, 708–10 (Tenn. 2000). A plaintiff may prove discrimination based on disability through either direct or indirect evidence. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004).

In the present case, the plaintiff asserts that the record contains direct evidence that Electrolux relied on Hoggatt's disability when it failed to accommodate his disability and instead terminated his employment. Specifically, Hoggatt alleges that at the time he was notified that his employment was being terminated, he was told that the reason was because his diabetes was a danger to himself and a risk to the company. In addition, Hoggatt argues, Electrolux has taken the position that Hoggatt was "unable" to work as a result of his medical condition.

Because this is a "direct evidence" case, Hoggatt can state a *prima facie* case of discrimination or failure to accommodate, and defeat summary judgment, by showing that (1) he is "disabled" within the meaning of the statutes; and (2) he is "otherwise qualified" for the job he sought or had held, either (a) without accommodations by the employer or (b) with the elimination of an allegedly essential job requirement or (c) with a proposed reasonable accommodation. While Hoggatt, as the plaintiff, bears the ultimate burden of persuasion, Electrolux has the burden of proving that any challenged job criterion is "essential," that is, a business necessity, or that a proposed accommodation would impose an undue hardship on it. *Monette*, 90 F.3d at 1186; *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 868–69 (6th Cir. 2007) (noting that failure "to make a reasonable accommodation falls within the ADA's definition of 'discrimination,'" and that claims relating to failure to accommodate necessarily involve direct evidence).

For purposes of its motion for summary judgment, Electrolux does not dispute that Hoggatt is "disabled" under the statutory schemes or that he has direct evidence of discrimination. Its motion is premised instead upon its arguments that (1) Hoggatt was not "otherwise qualified" to perform the essential functions of his job; (2) Electrolux reasonably accommodated Hoggatt's disability; and (3) Electrolux had a legitimate basis for terminating Hoggatt because he was demonstrably unable to comply with Electrolux's attendance policy, which was an essential job criterion.

### (1) Whether Hoggatt Is "Otherwise Qualified"

Electrolux argues that Hoggatt was unable to perform the job functions to which he was assigned because he became overheated and repeatedly reported to the nurse's station and reported that he was unable to work because his blood sugar level was too low. Electrolux also argues that Hoggatt's

statements on his DIB application corroborates its argument that Hoggatt was unable to work, because he swore in the context of that application that he was unable to work beginning September 18, 2008.

Hoggatt responds that he was "otherwise qualified" to perform the job of forklift operator, a job he successfully performed for over six months without significant attendance problems, during the first half of 2008. In support of its motion for summary judgment, Electrolux has offered no evidence that Hoggatt was unable to perform as a forklift operator. In fact, it was only after Hoggatt was transferred to a job requiring him to engage in manual labor in an unheated part of Electrolux's facility that he began experiencing substantial difficulties. These problems continued when he returned to work in September 2008 and was first placed in the extremely hot "bake off" or "Blue Surf" room, and then moved to the paint line. The paint line, though located in an area somewhat cooler than the bake-off room, was still admittedly quite warm.

Hoggatt is also correct that his statements regarding his ability to perform work-related activities, made in the context of his DIB application, do not necessarily preclude his claim under the ADA. In *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999), the plaintiff had successfully filed an application for DIB benefits and was pursuing an ADA claim. In reviewing the apparent tension between the two, the district court applied a rebuttable presumption against the plaintiff's recovery, reasoning that a representation to the Social Security Administration that she was "unable . . . to work" was inconsistent with her concurrent averment, in the context of her ADA claim, that she could successfully perform the essential functions of her job. The Supreme Court unanimously reversed, first noting that "if an individual has merely applied for, but has not been awarded [Social Security Disability Insurance] benefits, any inconsistency in the theory of the claims is of the sort normally tolerated by our legal system." *Id.* at 805. Accordingly, the Court refused to "apply a special legal presumption" that would allow Social Security claimants to bring an ADA suit only in very limited circumstances. *Id.* (citation omitted). On the other hand, the Court also recognized that, in some instances, a Social Security claim might "turn out genuinely to conflict with an ADA claim." *Id.* For example, when a plaintiff has sworn that she is "unable to work" for purposes of her Social Security claim, that assertion "will appear to negate an essential element of her ADA case—*at least if she does not offer a sufficient explanation*." *Id.* at 806 (emphasis added). The Court therefore held that "an ADA plaintiff cannot simply ignore the apparent

contradiction that arises out of the earlier [Social Security] total disability claim. Rather, she must proffer a sufficient explanation." *Id.*

Here, Hoggatt has offered an explanation for his statements made in the context of his Social Security claim: When he was terminated from Electrolux, he was told that his "diabetes was a danger to [him]self and a risk to their company." (Hoggatt Dep. 87, 119.) But as he explained, "I am not sure if I am disabled or not. That is not for me to decide." And the Social Security Administration determined that Hoggatt was capable of performing work as a forklift operator. That determination is consistent with Hoggatt's contentions in this lawsuit, and with his requesting to be accommodated by being placed in a forklift-operator position with Electrolux.

In short, there is at least a disputed issue of fact as to whether Hoggatt was "otherwise qualified" to perform the job he sought—that of forklift operator.

### *(2) Whether Electrolux Failed Reasonably to Accommodate Hoggatt*

The ADA defines "discrimination" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). "Reasonable accommodations" may include

> job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

Hoggatt argues that Electrolux initially failed to accommodate him under its own leave policies when Hoggatt requested medical leave during the summer of 2008. Electrolux's records reflect that Hoggatt applied for "Physical Disability and Personal Leave (Not Covered by FMLA)," and it appears Electrolux and Unum may have "dropped the ball" by processing and responding only to Hoggatt's FMLA request. In short, there is at least a disputed issue of fact as to whether Hoggatt reasonably believed he had been granted unpaid medical leave that was permitted under Electrolux's policies even though not actually covered by FMLA.

The facts viewed in the light most favorable to Hoggatt indicate that Electrolux failed to communicate with him in that regard, and informed him when he attempted to return to work that his employment had been terminated. When it agreed to re-hire him, it did not do so unconditionally, but

effectively "punished" him for his prior medical leave by (1) imposing a requirement that he provide medical documentation that he was released to return to work "without restrictions" and (2) placing him on a ninety-day probationary period during which he was to have "perfect" attendance.[3]

Hoggatt argues that the requirement that he return to work "without restrictions" was a *per se* violation of the ADA. (*See* Doc. No. 22, at 15 (citing *McGregor v. Nat'l RR Passenger Corp.*, 187 F.3d 1113, 1115–16 (9th Cir. 1999)).) The Court notes that no discrimination actually occurred as a result of that requirement, however, because Hoggatt presented the release and was allowed to return to work.

More importantly, however, he requested a reasonable accommodation in the form of being placed in a truly cooler work area, or being permitted to return to the position of forklift operator. Electrolux maintains it accommodated that request by sending Hoggatt to a "cooler" area, but the evidence is undisputed that the paint line, though cooler than the 120 to 130 degree bake-off room, was not actually cool. Further, there is no evidence in the record that Electrolux made a concerted effort to ascertain the existence of job openings for forklift operators or in actually cool areas of its facility.

In fact, a reasonable accommodation under the ADA includes, among other things, "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). "'An employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the [c]ompany for which that employee is otherwise qualified.'" *Kleiber*, 485 F.3d at 869 (quoting *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 257 (6th Cir. 2000)). "Where the requested accommodation is a job transfer, 'employers have a duty to locate suitable positions for' employees with disabilities." *Id.* at 870 (quoting *Burns*, 222 F.3d at 258). The employee may also be entitled to additional reasonable accommodation within the position to which he is to be transferred. *Id.* at 870 n.3. Hence the importance of the mandatory "interactive process." *Id.* at 871.

Employers have a duty to engage in an interactive process that "'requires communication and good-faith exploration of possible accommodations.'" *Id.* (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *jgmt. vac'd on other grounds*, 535 U.S. 391 (2002)). "The interactive process is mandatory, and both parties have a duty to participate in good faith." *Id.* "When a party

---

[3] There is no evidence in the record regarding how Electrolux treated similarly situated employees returning to work after extended medical leave, whether or not covered by FMLA

obstructs the process or otherwise fails to participate in good faith, 'courts should attempt to isolate the cause of the breakdown and then assign responsibility.'" *Id.* (quoting *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996)). Employers "who fail to engage in the interactive process in good faith . . . face liability if a reasonable accommodation would have been possible." *Barnett*, 228 F.3d at 1114.

In this case, Hoggatt has presented evidence indicating that a forklift position was actually open at the time he was requesting transfer to a forklift-operator job. Electrolux admittedly failed to consider Hoggatt for this position and instead discharged him. It is abundantly clear, in fact, that Electrolux failed to engage in the good-faith interactive process in attempt to reasonably accommodate Hoggatt. On this basis too, there is at least a disputed issue of fact as to whether Electrolux made any attempt to reasonably accommodate Hoggatt's disability.[4]

### (3) Electrolux Has Not Established That a Proposed Accommodation Would Impose an Undue Hardship on It.

Finally, Electrolux argues that, even assuming Hoggatt has direct evidence of discrimination, he "never proposed any accommodation that would have allowed him to perform his job." (Doc. No. 21 at 17.) Strangely enough, Electrolux also admits that Hoggatt proposed two possible accommodations— being moved into a cooler area or being put into a forklift driver position. Electrolux asserts that "[w]here there is more than one reasonable accommodation, the choice of accommodation is the employer's," *Smith v. Honda of Am. Mfg., Inc.*, 101 F. App'x 20, 25 (6th Cir. 2004), and that it acted reasonably when it chose to move Hoggatt into an air-conditioned area of Electrolux's facility. As set forth above, however, Electrolux's employees admit that the area in question was not actually cool. Electrolux further insists that, because Hoggatt could not work in that area, the company was justified in terminating his employment, because attendance is an essential job requirement.

First, it appears that the issue of whether attendance is an essential job requirement is itself a question of fact. Even assuming attendance is an essential job requirement, another question of fact

---

[4] As indicated in the discussion of Hoggatt's motion for summary judgment below, the Court is not actually making a factual finding that Electrolux was obligated to engage in the interactive process. Rather, in light of Electrolux's concession, solely for purposes of consideration of its motion, that Hoggatt was disabled by his condition, the Court presumes in ruling on Electrolux's motion that Electrolux incurred an obligation to participate in the interactive process to determine whether there were available jobs that Hoggatt could perform with or without a reasonable accommodation.

arises as to whether the proffered accommodation was actually reasonable, given that Electrolux purportedly knew that Hoggatt's diabetes caused him to have problems with heat, and that the area to which Hoggatt was moved was not actually cool. Electrolux was aware that Hoggatt desired a forklift operator job, and aware that he had apparently worked with relative successfully in that job for over six month. Electrolux has not established that moving Hoggatt back to a forklift operator job would have imposed an undue hardship on it.

### C. Conclusion: Electrolux's Motion for Summary Judgment

Multiple material factual disputes preclude entry of summary judgment in favor of Electrolux. Electrolux's motion will therefore be denied.

## III. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Hoggatt filed his own motion in response to Defendant's motion for summary judgment. For purposes of this motion, the facts must of course be viewed in the light most favorable to Electrolux as the non-moving party. Viewed from that perspective, the undisputed facts do not permit summary judgment in favor of Hoggatt either, so his motion too must be denied.

### A. Factual Background

The facts relevant to Hoggatt's motion for summary judgment are as follows.

Hoggatt has had Type II diabetes and high blood pressure for approximately eight years. He takes insulin and blood-pressure medications to regulate his condition. (Hoggatt Dep. 7:25–9:1.) Hoggatt claims that performing manual labor in an extremely hot environment causes his blood-sugar levels to drop and makes him very ill. (Hoggatt Dep. 48:1–11.) Hoggatt also testified that his diabetes in general causes his knees to become sore, makes it difficult to concentrate, and causes him to become short of breath and fatigued easily, and renders him unable to tolerate extreme heat or cold. (Hoggatt Dep. 9:7–20.) However, Hoggatt also testified that when working for Kroger grocery store, he would become overheated in the course of stocking shelves in the air-conditioned grocery store, and would have to take a break or his blood-sugar level would fall dangerously. In that instance, the problem was not that the environment was too hot, but that Hoggatt apparently became overheated performing manual labor in a cool environment. (Hoggatt Dep. 32:6–18.) Electrolux, however, was unaware of Hoggatt's prior difficulties working at Kroger. In fact, although Hoggatt disclosed his conditions (diabetes and high blood

pressure) on an Emergency Data sheet that was turned in to Electrolux's HR department at the time he was hired, Hoggatt stated on the same Emergency Data Sheet that he had no work-related restrictions, and specifically affirmed that he could work in extreme temperatures. Although many of Hoggatt's co-workers at Electrolux knew about his diabetes, including his supervisor Shelia Dorris, under whom he worked during the first half of 2008 (*see* Dorris Dep. 25:9–14, 28:20–21 ("He had told all of us that he was a diabetic.")), others did not. Specifically, Human Resources Director Michael Norton in HR did not know. (Norton Dep. 25:11–24.) Further, there is no medical evidence in the record corroborating Hoggatt's contention that his diabetic condition makes him unable to tolerate heat or manual labor.

Hoggatt began working for Electrolux as a temporary employee through Randstad on July 9, 2007 as a forklift operator. He took a class and became a certified forklift driver. He operated a forklift at Electrolux's main plant for approximately a month, and then worked at its Holley Carburetor Building for three or four months counting and sorting parts. Hoggatt claims that he did not get overheated operating a forklift or at the Holley Carburetor building because the areas where he worked, though not air-conditioned, had good air circulation.

In or around January 2008, Hoggatt began working as a forklift operator on the second shift at Electrolux's Wilson Street facility under the supervision of Shelia Dorris. Also in January 2008, Hoggatt became a full-time employee of Electrolux, which signaled that he had performed satisfactorily as a temporary employee. (Dorris Dep. 9:3–11.) As a full-time Electrolux employee he continued to work as a forklift operator on the second shift at the Wilson facility under Dorris's supervision until July 13, 2008. Dorris testified that his performance was satisfactory throughout that time (Dorris Dep. 12:19–22), though he did have some problems with absenteeism. (Dorris Dep. 23:14–18.) In April 2008, Hoggatt received written counseling regarding his absences, when his attendance points dipped to -1.0 [or negative one] point. At that point Hoggatt was notified that his probation period was extended to August 8, 2008, and that any unexcused absences prior to then would result in separation. (Dorris Dep. 30:11–15; Norton Dep. Ex. 3.) In addition, at both facilities where Hoggatt had operated a forklift for Electrolux up until that time, there was a total of only two forklift drivers working on his shift, including himself.

In July 2008, the second-shift position in which Hoggatt was working was eliminated altogether, and Hoggatt was given the opportunity to transfer to his choice of three open forklift-operator positions in

other departments, all also on second shift. (Dorris Dep. 21:16–23:5.) He elected a "materials coordinator" position in the silk screen department, where he was supervised by Suzette Thornton. When he began working in silk screen on July 14, 2008, Hoggatt was initially assigned to operate a forklift. Thornton pulled him from that position, however, because she perceived that he was driving the forklift so slowly that it was unsafe and creating a safety hazard for others around him. Other forklift operators in the same area complained about Hoggatt's driving too slowly as well. Thornton initially told him he needed to pick up the pace a little bit because the other drivers could not get around him to get where they needed to go, but he continued to creep along at a snail's pace. (Thornton Dep. 34:9–35:9.) Thornton thought the problem might have been related to "first-day jitters," so she allowed him to continue to operate the forklift "off and on" the next few days when he was there, but he continued to move too slowly, as if he was afraid of the forklift. (Thornton Dep. 36:9–19.)

Thornton testified that she did not know Hoggatt was diabetic until the first time she removed him from the forklift for driving too slowly. He mentioned to her at that time that he thought his blood sugar was low and that he was getting too hot. He stood in the doorway to "catch a breeze" in order to cool off. (Thornton Dep. 42:14–43:6.) She also testified that driving a forklift was a hot job because "you're sitting on a motor and that heat is coming straight up through the seats, so you're going to be hot" unless "every bay door is open," which was not always possible. (Thornton Dep. 43:11–19.) In other words, according to Thornton, Hoggatt complained on the first day of working under her supervision that being on the forklift was making him too hot.

The first time Hoggatt complained about being too hot, Thornton sent him to the nurse's station. He stayed there thirty minutes before returning; upon his return he was assigned to pull scrap material and "build foam," which involved taking Styrofoam sheets out of a box and straightening them, but Hoggatt soon complained again that the heat was making him sick. He reported for the second time that day to the nurse's station for another thirty-minute break to cool off. When he came back, Thornton relieved him of the job of pulling scrap and allowed him only to build foam, because that was not a physically demanding job. He did this job for a few minutes before again complaining that he was getting too hot and returning to the nurse's station for the third time that day, before finally going home. (Thornton Dep. 44:2–48:3.) The next day was apparently much the same, and Thornton recalled that he

left early on the third day. He called in sick one day and failed either to call or to show up two days that week. (Thornton Dep. 59:4–7.) As a result of those two no-shows, Hoggatt could and should have been terminated that week. (Thornton Dep. 60:5–9.) The absences apparently were not recorded correctly, however, and the paperwork to process his termination was not filled out. (Thornton Dep. 62:2–3.)

In any event, there is no dispute that Electrolux has a policy permitting physical disability and personal leave for employees who have been employed less than twelve months and therefore are not eligible for FMLA leave. (*See* Norton Dep. 14:6–25 and Ex. 2.) After working for one week in the silk-screen department, Hoggatt went to HR to request leave materials. He took the paperwork home, filled it out, and turned it in the next day. From that point, Hoggatt believed he was on a medical leave of absence under Electrolux's policies from July 22, 2008 until September 12, 2008. Either because Hoggatt failed to communicate properly with his supervisors at Electrolux or because of a breakdown in communication within Electrolux, the paperwork authorizing Hoggatt to take medical leave was never completed, and Electrolux was unaware of what Hoggatt's status actually was during that time frame, other than that he had not been approved for FMLA leave. (Johnson Dep. 37:17-42:24, Exs. 7–9; Hoggatt Dep. 96:25–97:9.) Electrolux denies that Hoggatt had any reason to believe he had been granted medical leave, particularly in light of the letter he received notifying him that he was not eligible for FMLA leave, and because he never received approval from anyone at Electrolux. However, no one from Electrolux notified him that he was not approved either. (Hoggatt Dep. 103:2–21.) Although Electrolux contends that Hoggatt only applied for FMLA leave and failed to follow Electrolux's policies for requesting short-term disability leave, it is also apparent that Electrolux neglected to provide Hoggatt with information regarding his ability to take medical leave not covered by FMLA.

In any event, Hoggatt reported back to work at Electrolux on or about September 12, 2008, having not communicated with anyone at Electrolux since his departure on July 22. Although Hoggatt maintains that he was "terminated" and then "rehired," Electrolux insists that it simply "reinstated" him without technically terminating his employment. As Electrolux points out, Hoggatt was not required to complete a new employment application or any other new-hire paperwork, and he was not treated as a new employee for purposes of Electrolux's leave policy. That is, he was allowed to return to work with "0" attendance points instead of the +2 points that new hires generally start with. (Norton Dep. 39:13–25;

Norton Dep. Ex. 11.)  Further, his employment remained probationary; that is, he was required to maintain perfect attendance for ninety days from the date of his reinstatement.  (Norton Dep. Ex. 11.)  On the other hand, as Hoggatt points out, Electrolux's interrogatory answers as well as its director of HR, Michael Norton, stated that Hoggatt was terminated pursuant to Electrolux's attendance policy, and "rehired" after he provided a release from his healthcare provider.  (Norton Dep. 31:13–22; Def.'s Interrog. Ans. No. 11.)[5]

Regardless, Hoggatt was informed he could not return to work without a doctor's note releasing him to work without restrictions.  He obtained the requisite release (Norton Dep. Ex. 13[6]) and returned to work on September 15, 2008.

By the time Hoggatt returned to work, the silk-screen position he had held when he left had been filled and his former supervisor, Thornton, did not have any open positions.  Thornton spoke with another supervisor, Mary Slagle, and ascertained that she had an opening in the "bake-off" room, so Hoggatt went to work in that department.  The bake-off room was extremely hot, and Hoggatt immediately reported that he had difficulty with the heat there.  He asked to be moved to either a forklift job or a cooler area.  On September 18, 2008, he was transferred to the "paint line" to "hang parts."  The paint line was in an air-conditioned area but Hoggatt still found the area to be very hot and the work to be physically demanding.  According to Electrolux, the area was not "that hot" (Slagle dep. 29:21), and the task to which Hoggatt was assigned was not physically strenuous, as it only involved picking up parts and hanging them on a

---

[5]  It is not clear whether this dispute is material.  Hoggatt insists that he was rehired on discriminatory terms since he was not started at +2 attendance points like other new hires.  He has not shown that he was treated differently from other employees rehired under similar conditions, however, and the fact remains that he had -1.0 attendance points as of April 2008 and was on probation for attendance issues through August, even before his unexcused absences in July or taking medical leave.

[6]  The release initially provided by Hoggatt when he returned on September 12 was a generic form "Excuse Slip" from Robertson County Medical Group stating:  "TO WHOM IT MAY CONCERN:  _ Dennis Hoggatt _ is under my care. He/She . . . is released to return to work on__ 9/13/08 __. . . ." (Norton Dep. Ex. 13.)  The form was signed by a practitioner whose signature is illegible.  That practitioner simply filled Hoggatt's name in on the form and checked the box to release him to return to work.  The practitioner did not check any of the boxes indicating Hoggatt's state of physical health, restrictions or medications, or even the reason for Hoggatt's extended medical leave.  After Hoggatt was requested to provide a release without restrictions, he apparently went back to the same Medical Group to have the same practitioner fill out the form again.  The second form is dated September 15, 2008 and the practitioner again checked the box to release Hoggatt to return to work on September 13.  This time the practitioner put an "x" in the box for "Restrictions," and wrote "no restrictions."  He also checked the box for "Other," and wrote:  "Please excuse days July 22nd 2008 through September 13th 2008, per D.M. educator reportedly."  (*Id.*)

line. Nonetheless, Hoggatt again became ill working there. Each of the four days he worked in September, he reported to the nurse's station. (Hoggatt Dep. 48:1–6.) Hoggatt claims that he asked again to be placed back in a forklift-operator position and that he was told by someone in HR that she was not sure whether there were any open forklift positions but she would get back to him. (Hoggatt Dep. 124:17–22.) Hoggatt has also presented documentary evidence, unrefuted by Electrolux, that a second-shift forklift job in the silk-screen department became available around September 17, 2008. (Clark Dep. Ex. 3; Johnson Dep. 74:7–13.)

Electrolux maintains, however, that Hoggatt was not eligible for transfer to the forklift position because in order to transfer, he was required to participate in a bidding process, which he never did. In addition, Hoggatt was technically ineligible to participate in the bidding process because he was still on disciplinary probation. The evidence in the record further indicates, however, that there were no bidders for the open forklift job, and it was sent to Randstad to be filled by a temporary employee. It is undisputed that Hoggatt was not notified about or considered for the forklift job.

Hoggatt was discharged from his employment with Electrolux on September 18, 2008 for violation of the terms of his reinstatement. At that point he had spent more time at the nurse's station than working during the four days he had worked. He was told by Veronica Johnson that if he went home, he would be terminated. He chose to go home, and was terminated.

At no time did Hoggatt present a doctor's note indicating he was under any medical restrictions. However, after he was terminated from Electrolux, he applied for Social Security Disability Insurance benefits. On his application, he stated that he "became unable to work because of [his] disabling condition on September 18, 2008." (Doc. No. 21-8, at 1.) Also included in his application is a medical certificate completed in November 2008 stating Hoggatt was not able to work. The Social Security Administration denied Hoggatt's application for benefits, however, based on its review of the medical evidence and its conclusion that Hoggatt was able to work as a forklift driver.

## B.    Applicable Legal Standard

The ADA prohibits covered entities from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms,

conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Further, the ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A).  To establish a *prima facie* case of disability discrimination based on indirect evidence,[7] a plaintiff must demonstrate that (1) he is disabled; (2) he is otherwise qualified for the job, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) that the employer knew or had reason to know of his disability; and (5) that, after his termination, the position remained open, or the disabled employee was replaced.  *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1185 (6th Cir. 1996) (citations omitted); *see also Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997) ("For his ADA claim to succeed, plaintiff must prove that (1) he has a disability; (2) that he is 'otherwise qualified' for the job; and (3) that defendants either refused to make a reasonable accommodation for his disability or made an adverse employment decision regarding him solely because of his disability."  (citing *Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir. 1996)).  Under this scheme, if the plaintiff makes the required showing, the defendant must then offer a legitimate explanation for its action.  If the defendant satisfies this burden of production, the plaintiff must introduce evidence showing that the proffered explanation is pretextual.  *Walsh v. United Parcel Serv.*, 201 F.3d 718, 724 (6th Cir. 2000).

### C.    Application of the Law to the Facts

In the present motion, Hoggatt refutes Electrolux's motion for summary judgment in the same memorandum in which he seeks to support his own motion for summary judgment.  His memorandum seems largely to ignore the reality that the Court's view of the facts, and thus the legal standards applied to those facts, differ depending upon which motion is being considered.[8]  In reviewing Hoggatt's motion, of course, the Court construes the facts in the light most favorable to Electrolux as the non-moving party

---

[7] Hoggatt claims that he has a "direct evidence" that he was fired "because of" his disability.  Specifically, Hoggatt asserts he was told he was being discharged because "[his] diabetes was a danger to [him]self and a risk to their company."  (Hoggatt Dep. 119:3–5.)  Electrolux denies that this statement was ever made and has succeeded in creating a disputed issue of fact as to that issue.  Viewing the facts in the light most favorable to Electrolux, as the Court must for purposes of Hoggatt's motion, the Court must presume that the statement was not made.  Consequently, at least for purposes of Hoggatt's motion, the analysis that is to be applied in this circuit to direct-evidence cases is not relevant.

[8] Electrolux's concession for purposes of its own motion that Hoggatt was disabled by his diabetes does not amount to a concession for purposes of *Hoggatt's* motion that he was disabled under the ADA.

to determine whether, based on those facts, Hoggatt is entitled to judgment in his favor as a matter of law. The Court finds that material issues of fact preclude summary judgment in favor of the plaintiff. Specifically, there are questions of fact as to whether Hoggatt was actually disabled, whether he was a "qualified individual," and whether his discharge was "because of" his disability.

### (1) Whether Hoggatt Is "Disabled"

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).[9] Hoggatt claims that he is actually disabled by the impairment of diabetes.[10]

Whether a plaintiff has a disability as defined by the ADA is an individualized inquiry. *Sutton v. United Airlines. Inc.*, 527 U.S. 471, 483 (1999). "Merely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 195 (2002). In *Sutton*, the Supreme Court cautioned that a disability "exists only where an impairment 'substantially limits' a major life activity," which requires a showing of "considerable" limitation or one that limits a major life activity "to a large degree." *Sutton*, 527 U.S. at 491; *Agnew v. Heat Treating Servs. of Am.*, No. 04-2531, 2005 WL 3440432, at *4 (6th Cir. Dec.14, 2005) (citing *Sutton* ). An impairment will be found to substantially limit a major life activity if the individual is "[u]nable to perform a major life activity that the average person in the general population can perform" or if the individual is "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the

---

[9] This provision in particular was substantially modified by the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008). As stated above, however, the Amendments Act did not take effect until after the events giving rise to the present suit.

[10] To be "regarded as" disabled, the employer must either *mistakenly* believe that a person has a physical impairment that substantially limits one or more major life activities, or *mistakenly* believe that an actual, non-limiting impairment substantially limits one or more major life activities. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1066 (6th Cir. 2008) (citing *Sutton v. United Air Lines*, 527 U.S. 471, 489 (1999)). The ADA's regarded-as-disabled provision is designed to "stamp out the stereotyping of and discrimination against persons with disabilities in all their forms." *Id.* (quoting *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001)). In this case Hoggatt insists that he is actually disabled and that he required a reasonable accommodation of that disability in order to work at Electrolux. Hoggatt does not argue or offer evidence that Electrolux was "mistaken" in its views regarding the severity of his impairments, so Hoggatt's arguments pertaining to the "regarded-as" prong are misplaced.

general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1); *see also Fraser v. Goodale*, 342 F.3d 1032, 1040 (9th Cir. 2003), *cert. denied sub nom. U.S. Bancorp v. Fraser*, 541 U.S. 937 (2004). The regulations implementing the ADA explain that "major life activities" include such functions as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

The term "substantially limits" with respect to an individual's ability to work is also defined in the regulations:

> The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i). In determining whether a claimant is significantly restricted in his ability to perform "either a class of jobs or a broad range of jobs in various classes," courts generally consider the nature, severity, duration, and impact of the impairment. 29 C.F.R. § 1630.2(j)(2)(i)-(iii). The regulations further provide that courts may consider other factors, including:

> (A) The geographical area to which the individual has reasonable access;
>
> (B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
>
> (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii)(A)-(C); *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 252 (6th Cir. 2000).

Given these principles, it is clear that Hoggatt has not presented evidence from which a reasonable jury could conclude that his impairment, diabetes, substantially limits him in one or more major life activities. Obviously, diabetes is an impairment, but it is not *per se* a disabling condition.[11] *Cf. E.E.O.C. v. Murray, Inc.*, 175 F. Supp. 2d 1053, 1058–59 (M.D. Tenn. 2001) (recognizing that diabetes may be a physical impairment that does not necessarily substantially limit any major life activities).

---

[11] The supervisor on Hoggatt's shift the day he was terminated, Jacqueline Clark, is also diabetic yet she has worked at Electrolux for thirty-five years. (Clark Dep. 14:23, 4:19–21.)

Rather, it is a disease that varies widely in terms of the severity and type of symptoms it causes. The Supreme Court has instructed that "the existence of a disability [must] be determined in such a case-by-case manner" and, further, that "[a]n individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 199 (2002). Here, while there is no dispute that Hoggatt was diabetic, the only evidence in the record regarding the limitations resulting from this condition is his own testimony that he needs frequent restroom breaks, has difficulty with physically demanding labor, cannot tolerate working in extreme heat, and must take frequent breaks to cool off if he becomes overheated. This evidence standing alone, even if accepted as true, does not prove that he is (or was at the relevant time) substantially limited in one or more major life activities, including the major life activity of working. 42 U.S.C. § 12102(2).

Critically, he has not presented any medical evidence whatsoever to corroborate his assertions that he is restricted by his medical condition. To the contrary, when Hoggatt returned to work in September 2008, he presented a doctor's note stating he was released to return to work without restrictions. Moreover, when he began working for Electrolux, although he disclosed that he had diabetes, he affirmed that he had no work-related limitations. In short, the only information in Electrolux's possession regarding Hoggatt's condition came from Hoggatt's own assertions that he could not tolerate heat or physically demanding labor. That evidence by itself does not establish that Hoggatt is disabled for purposes of the ADA.[12] *Cf. Toyota Motor Mfg.*, 534 U.S. at 198 ("[T]he ADA requires those claiming the Act's protection . . . to prove a disability by *offering evidence* that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial."); *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1106–07 (6th Cir. 2008) (affirming district court's conclusion that plaintiff had created a genuine issue of material fact as to her claim that she was actually disabled because she presented an expert report from her physician stating she was disabled, as well as deposition testimony and doctors' letters and evaluations laying out the severity of the plaintiff's problems and the possible impact these issues had on her ability to work); *Fraser v. Goodale*, 342 F.3d 1032, 1038–42 (9th Cir.

---

[12] Hypothetically speaking, under the circumstances Hoggatt's supervisors had no reason to know for sure whether Hoggatt was actually limited by a medical condition or whether he was simply lazy or hung over, or unhappy being assigned to perform any task other than driving a forklift.

2003) (concluding that diabetes is a "physical impairment" under the ADA, and finding a disputed issue of material fact as to whether plaintiff was substantially limited by that impairment in the major life activity of eating, where plaintiff presented evidence expert evidence as well as her own testimony regarding her "perpetual, severely restrictive, and highly demanding" dietary and treatment "regimen" necessary to control her diabetes).

In sum, there is a disputed issue of fact as to whether Hoggatt was disabled, the first element of his *prima facie* case of ADA disability. As a result, there is also a question of fact as to whether Electrolux knew or had reason to know that Hoggatt was a disabled individual, particularly in light of Hoggatt's failure to present any medical evidence that he had work-related restrictions that might need accommodation. These findings alone require denial of his motion for summary judgment. But there are other material factual disputes as well, as discussed below.

### (2) Whether Hoggatt Was a "Qualified Individual"

Even if the Court presumes that Hoggatt was actually disabled, the next question is whether he was a "qualified individual." The ADA defines a "qualified individual" as someone "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Status as a "qualified individual" is an essential element of an ADA claim, and an ADA plaintiff has the burden of proving this essential element. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999); *Walsh v. United Parcel Serv.*, 201 F.3d 718, 724–25 (6th Cir. 2000).

The Supreme Court has stated that "a plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate [that] essential element of her ADA case—at least if she does not offer a sufficient explanation." *Cleveland*, 526 U.S. at 806. Hoggatt made such an assertion in his DIB application materials. Based on the holding in *Cleveland*, this Court held in ruling on Electrolux's motion, above, that Hoggatt had offered an adequate explanation of the statement in his DIB application to defeat Electrolux's motion for summary judgment. By the same token, however, the fact that Hoggatt stated under oath to the Social Security Administration that he became unable to work on September 18, 2008 is sufficient to create a disputed issue of fact as to whether he was a "qualified individual" for purposes of his own motion.

Other evidence in the record further tends to negate Hoggatt's claim that he was a "qualified individual" under the ADA. Hoggatt insists that he could have performed the essential functions of employment at Electrolux if Electrolux had reasonably accommodated his disability either by assigning him to operate a forklift or to work in a truly cool environment. That evidence is called into question by the evidence that he was unable to work in an air-conditioned grocery store when he was employed by Kroger, and by his supervisor's testimony that Hoggatt complained he was overheating while working on the forklift in the silk-screen department in July 2008. In short, there is evidence in the record from which a reasonable jury could conclude that Hoggatt, if disabled, was not capable of performing the essential functions of the job of forklift operator or any other employment at Electrolux.

### *(3)* Whether Hoggatt's Discharge Was Because of His Disability

Finally, because there is an issue of fact as to whether Hoggatt was actually disabled, there is necessarily a question of fact as to whether he was discharged because of that disability. Even if we assume momentarily that he was disabled, there is still a question of fact as to whether he was discharged because of his disability. Electrolux disputes Hoggatt's claim that Hoggatt was told that his diabetes was a danger to himself and the company, and further disputes Hoggatt was told he should go on disability. In fact, the head of Human Resources denies knowledge that Hoggatt was diabetic, and there is evidence in the record from which a reasonable jury could conclude that Hoggatt was fired because he violated the terms of his probationary rehire when he left without authorization on September 18, 2008. On this basis too, Hoggatt's motion must be denied.

### IV. CONCLUSION

For the reasons set forth herein, the Court finds that material issues of disputed fact preclude summary judgment in favor of either party, so both motions for summary judgment (Doc. Nos. 20 and 22) will be denied. An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge